IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Carmen Maria Martinez, | ) | C/A No.: 1:11-850-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

A.     Procedural History

On November 5, 2007, Plaintiff filed an application for DIB under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433. Tr. at 101–03. In her application, she alleged her disability began on April 14, 2007. Tr. at 101. Her application was denied

1

initially and upon reconsideration.  Tr. at 77, 79.  On August 11, 2009, Plaintiff had a hearing before an Administrative Law Judge ("ALJ").  Tr. at 17–59.  The ALJ issued an unfavorable decision on October 23, 2009, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 9–16.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 11, 2011.  [Entry #1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 51 years old at the time she alleges her disability began.  Tr. at 101. She completed three and a half years of college in Puerto Rico and her past relevant work ("PRW") was as a parts inspector on an assembly line, a production worker, and a supervisor in a food production plant.  Tr. at 24, 26, 41–42, 135.  She alleges she has been unable to work since April 14, 2007.  Tr. at 101.

2.      Medical History

On April 14, 2007, Plaintiff was involved in a car accident.  Tr. at 198. Paramedics took her to the emergency room where she complained of pain in her neck, right shoulder and wrist, and left knee.  *Id.*  X-rays showed that she had a fractured right wrist, but her spine and shoulder were not fractured.  Tr. at 199, 211–12.  She was

released with a splint.  *Id.*  Subsequent x-rays through July 2007 demonstrated normal or near normal alignment of the fracture.  Tr. at 215–22.

Later in April, Plaintiff presented to Timothy Rop, M.D., for follow up.  Tr. at 405.  She complained of headaches, problems with balance, nausea, and impaired memory.  *Id.*  Dr. Rop noted that she was alert, oriented, and neurologically intact; and had a normal gait.  *Id.*  He ordered a CT brain scan, which showed no brain injury, but mild white matter changes.  Tr. at 214, 405.  The next month, Plaintiff saw Dr. Rop again, and complained of pain in her neck that radiated to her right shoulder, as well as some right knee pain.  Tr. at 402.  Dr. Rop noted that she appeared well, but held her head stiffly.  *Id.*  He diagnosed her with neck pain with spasm and right knee pain.  *Id.*

In August 2007, Plaintiff saw Dr. Rop and complained of continued stiffness in her wrist and difficulty with overhead reaching, as well as intermittent dizziness and nausea.  Tr. at 399.  Dr. Rop noted some right shoulder tenderness with very limited flexion consistent with adhesive capsulitis.  *Id.*  Dr. Rop observed that Plaintiff's coordination and neurological functioning were intact, but assessed Plaintiff as having benign positional vertigo and right adhesive capsulitis.  *Id.*

One week later, Plaintiff presented to orthopedist Stephen Kana, M.D., for her right arm and neck pain.  Tr. at 234.  She described her pain as a 10 out of 10, but stated she was not really taking any medications for it.  *Id.*  Dr. Kana noted that her wrist fracture had healed, but that she continued to have pain up and down her arm and her wrist was swollen, tender, and had a limited range of motion.  *Id.*  Plaintiff reported

occasional blurred vision in her eyes when she moved her head or neck around. *Id.* Dr. Kana observed a good range of motion in Plaintiff's right elbow and limited range of motion in her shoulder and neck. *Id.*

Dr. Kana ordered an MRI of Plaintiff's neck, which showed age-appropriate degenerative change at C4–C5 through C6–C7. Tr. at 226. Dr. Kana noted that Plaintiff's "frozen shoulder" (adhesive capsulitis) was his main concern, and told Plaintiff it was "[e]xtremely important" that she engage in physical therapy for her shoulder. Tr. at 233.

In September 2007, Plaintiff complained of nausea, vomiting, and right shoulder pain and underwent a carotid duplex examination at Dr. Kana's request. Tr. at 223–24. On examination, doctors noted that she experienced severe distress and vomiting when her neck was rotated to the left. *Id.*

Also in September 2007, Plaintiff presented to Henry Butehorn III, M.D., complaining of dizziness. Tr. at 258. Dr. Butehorn noted that the disability associated with Plaintiff's dizziness was severe and required her to constantly make adjustments to daily activities. *Id.* Dr. Butehorn noted that rapid change in position, rotating the head, walking, and bending over to pick something up aggravated Plaintiff's dizziness. *Id.* Dr. Butehorn observed Plaintiff to be in no apparent acute or chronic distress with a normal mood and affect and normal level of psychiatric functions. Tr. at 260–61. Auditory testing was abnormal and Plaintiff became dizzy and vomited when turning her head to the right. Tr. at 256–57.

At a follow-up visit on October 12, 2007, Plaintiff said that her dizziness was better than the last visit, but still present on and off. Tr. at 262. After an MRI on October 18, 2007 showed "extensive white matter disc space much more than expected for patient age" (which the radiologist opined was unlikely from her car accident), Dr. Butehorn referred her to a neurologist. Tr. at 245–46, 265.

On November 6, 2007, Plaintiff presented to neurologist Rowena Desailly-Chanson, M.D. Tr. at 305. Dr. Chanson found that Plaintiff was alert and oriented; had intact language abilities; normal coordination; symmetrical reflexes; and normal motor strength, sensory, and gait; but that she had limited short-term recall. *Id.* Dr. Chanson noted a "normal neurological exam with no evidence of focal neurological deficit" except for short-term cognitive and memory issues, headaches, and episodic vertigo. Tr. at 305–06. Dr. Chanson ordered a spinal tap (lumbar puncture), which showed white matter hyperintensities with unclear significance. Tr. at 304. Dr. Chanson noted that she could find no "clear cut neurological" reason for Plaintiff's symptoms. *Id.*

Plaintiff saw Dr. Chanson again on December 19, 2007. Tr. at 314. Dr. Chanson noted that Plaintiff had "minimal" symptoms of vertigo and that Plaintiff "was doing very well with no other complaints except those related to menopausal issues." *Id.* She opined that Plaintiff did not have any neurological symptoms except for "mild cognitive complaints and pain," and that examinations continued to show normal findings. *Id.* Dr. Chanson noted Plaintiff only had balance issues when she had vertigo. *Id.* She opined

that Plaintiff's had no residual neurological deficit from her positional vertigo.  Tr. at 315.

In January 2008, state-agency physician William Hopkins, M.D., reviewed Plaintiff's medical records and noted that despite her vertigo, Plaintiff's examinations were largely normal.  Tr. at 316–23.  He opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; sit, stand, and/or walk six hours each in an eight-hour work day; push and/or pull without limitations; frequently balance, stoop, kneel, crouch, and climb ramps and stairs; occasionally lift overhead with her right arm (no restrictions with her left); frequently handle with her right hand (no restrictions with her left); never climb ladders, ropes, or scaffolds; and should avoid even moderate exposure to hazards.  Tr. at 317–20.

Also in January 2008, state-agency psychologist Lisa Varner reviewed Plaintiff's medical records, and opined that Plaintiff had non-severe depression and anxiety resulting in mild difficulties in maintaining concentration, persistence, and pace.  Tr. at 324–37.

In February 2008, Plaintiff saw Dr. Kana for her frozen right shoulder with continuing complaints of pain and loss of motion.  Tr. at 343.  Dr. Kana noted that Plaintiff had not done any physical therapy on her shoulder, and planned to get her into a rehabilitation program.  *Id.*  The next month, Dr. Kana noted that Plaintiff's right shoulder range of motion was "considerably better," but that her big issue was pain.  Tr. at 342.  He gave her a cortisone injection.  *Id.*

In April 2008, state-agency psychologist Debra Price, Ph.D., reviewed Plaintiff's medical records and agreed with Dr. Varner's psychiatric opinion. Tr. at 344–57. Dr. Price noted that during a telephone interview, Plaintiff stated she does all of her cooking, cleaning, and shopping; handles her bills and money; and watches television and walks daily. Tr. at 356. Plaintiff stated she gets headaches regularly and will take pain medication when necessary, but that she does not want to take medication regularly. *Id.*

In May 2008, state-agency physician Seham El-Ibiary, M.D., reviewed Plaintiff's medical records and agreed with Dr. Hopkins regarding Plaintiff's physical limitations, except he opined that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; had a limited ability to push and/or pull with her right arm; could frequently reach and finger with her right arm; and could occasionally climb ladders, ropes, and scaffolds. Tr. at 358–65.

In May 2008, Plaintiff presented to Dr. Rop complaining of depression for nearly a year and stating that she had previously had an excellent response to Lexapro for depression. Tr. at 395. Dr. Rop noted a mildly depressed affect and prescribed an antidepressant. Tr. at 396. The next month, Plaintiff saw Dr. Rop and reported that the antidepressants were working well with no side effects. Tr. at 391.

Plaintiff also saw Dr. Chanson in June 2008 for headaches. Tr. at 377. She complained of almost daily headaches, significant anxiety and depression, and mild memory issues. *Id.* Dr. Chanson noted that examinations continued to show normal findings, opined that Plaintiff had tension headaches, and prescribed medications. *Id.*

Two months later, in August 2008, Plaintiff saw Dr. Chanson who noted that Plaintiff's headaches and ability to sleep had "improved significantly" on medications, and that her depression and anxiety had improved as well  Tr. at 376.

In September 2008, Plaintiff saw Dr. Chanson and reported that she had passed out twice.  Tr. at 375.  Dr. Chanson noted that Plaintiff's depression medication might be causing this, and that Plaintiff's neurological exam findings were normal.  *Id.*  Dr. Chanson indicated that Plaintiff's headaches had improved in intensity and frequency with medication and that her depression and anxiety had likewise improved.  *Id.*  Plaintiff returned to Dr. Chanson in October 2008 with increased frequency of migraine headaches despite prophylactic medication.  Tr. at 374.  Dr. Chanson opined that Plaintiff may be orthostatic or her headaches may be caused by dehydration or her medications.  *Id.*

In December 2008, Plaintiff saw Dr. Rop for follow up.  Tr. at 388.  Dr. Rop noted that Plaintiff had an "excellent response" to her depression medication, "no depressive symptoms," and no neurological deficits.  Tr. at 388–89.  The same month, Dr. Chanson again noted that Plaintiff's tension headaches had improved with prophylactic medication and that her neurological exam was normal.  Tr. at 373.  Plaintiff reported no further events of syncope (fainting).  *Id.*

In April 2009, Plaintiff saw Dr. Chanson and complained of a severe headache.  Tr. at 372.  Dr. Chanson noted that Plaintiff had been "noncompliant with her preventative medications" and that her physical examination was normal.  *Id.*  Dr. Chanson ordered her to restart her medications.  *Id.*

C.      The Administrative Proceedings

          1.      The Administrative Hearing

               a.      Plaintiff's Testimony

At the August 11, 2009 hearing, Plaintiff testified that she had pain in her right shoulder and that it was difficult to move. Tr. at 27. She stated she had pain in her right wrist and, in the morning, in her knees too. Tr. at 28–29. Plaintiff said she also had fainting spells and headaches "two or three" times per week each. Tr. at 27–28, 38. She said she was depressed, and that she cried and felt nervous "all the time." Tr. at 39. She thought her depression would affect her ability to communicate and work with co-workers. *Id.* She also claimed to have memory problems. Tr. at 39. Plaintiff testified that she took medication for depression (which helped "sometimes"), headaches, and to help her sleep, but did not take medication for her shoulder, wrist, knees, or fainting. Tr. at 27–29. She stated that she had hearing problems, but had not been told she needed a hearing aid. Tr. at 29–30. She testified she is blind in her left eye and her right eye is getting worse all the time. Tr. at 30. She said her glasses help her see things close, but she has problems seeing things far away and has never had a driver's license. Tr. at 30, 35.

Plaintiff testified that she could walk up to 10 minutes before needing to sit, sit for an hour, and lift up to "[a]bout five pounds," but could only lift two pounds with any frequency. Tr. at 31–32. She said bending over and walking made her dizzy and that she had frequently fallen because of her vertigo. Tr. at 37. She testified that she could not

reach overhead with her right arm, and had trouble gripping and holding things with her right hand. Tr. at 39. She stated that when she had a migraine she would have to lie down all day and became nauseous and sensitive to light. Tr. at 38–39.

Plaintiff stated she did not have any friends, but spent time with her family and went to the park with them. Tr. at 33–34. She said she went to church every Sunday. Tr. at 34. She also read the Bible, dressed and bathed herself, cooked, shopped with her husband, did laundry, and vacuumed with her left hand. Tr. at 35–36. She stated she does not wash dishes because she had been breaking them and her husband starting buying plastic plates. Tr. at 36, 40–41.

Upon questioning by Plaintiff's counsel, Plaintiff stated her left hand was in pain too. Tr. at 42. She testified that she could not do any of her prior jobs and would be unable to be a supervisor at a desk because her memory is not good and it would be too stressful. Tr. at 43.

b.     Plaintiff's Husband's Testimony

Plaintiff's husband testified that since her car accident, Plaintiff had pain in her shoulders and neck, headaches, and dizziness. Tr. at 45–46. He stated that Plaintiff has fallen several times as a result of her dizziness and he did not think it would be safe for her to work around moving parts or machinery. *Id.* He testified that she was also less happy, cried, and had problems sleeping. Tr. at 47–48. He stated that she stays in the house during the day and only goes out with him. Tr. at 48.

c.      Vocational Expert's Testimony

A Vocational Expert ("VE") also reviewed the record and testified at the hearing. Tr. at 51. The VE categorized Plaintiff's PRW as an assembly-line worker as medium, semi-skilled work; as a production worker as light, unskilled work; and as a food-production supervisor as light, semi-skilled work. Tr. at 52. The ALJ described a hypothetical individual of Plaintiff's vocational profile with restrictions that limited the hypothetical individual to frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; occasional balancing and crawling; frequent stooping, kneeling, and crouching; restricted use of the right upper extremity to frequent reaching in all directions; restricted use of the right hand to frequent fingering and fine manipulation of items no smaller than the size of a paper clip; and avoiding even moderate exposure to hazards. Tr. at 53. Because Plaintiff testified she could not see far, the ALJ also limited the hypothetical individual to jobs that do not require seeing a far distance. *Id.* The VE testified that the hypothetical person could perform Plaintiff's PRW as a supervisor in a food plant. Tr. at 54. The VE testified the hypothetical person could also do work as a housekeeper and limited cashier work. *Id.*

The ALJ then described a second hypothetical person with the same restrictions except limited to occasional reaching, fingering, and handling with the right upper extremity. Tr. at 54–55. The VE testified that such a person would not be able to perform Plaintiff's PRW and could perform only a very limited number of cashier jobs. Tr. at 55. The VE stated that a limitation to simple, routine, repetitive tasks or limiting

the hypothetical individual to occasional interaction with the public would eliminate the limited number of cashier jobs. *Id.*

Upon questioning by Plaintiff's counsel, the VE testified that additional limitations related to changing head position, rotating the head, and walking or bending over frequently would eliminate Plaintiff's PRW and the other jobs previously mentioned by the VE. Tr. at 56–57.

### 2. The ALJ's Findings

In his October 23, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2. The claimant has not engaged in substantial gainful activity since April 14, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: syncope, vision problems, pain secondary to right wrist fracture, knee arthritis, and right shoulder arthritis (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is limited to frequent climbing of ramps and stairs, occasional use of ladders, ropes, and scaffolds, occasional balance and crawling, and frequent stooping, kneeling, and crouching. Furthermore, the use of her right upper extremity is restricted to frequent reaching in all directions, and she is limited to frequent handling and finger [sic] with her right hand. The claimant must also avoid even moderate exposure to hazards and is limited to jobs requiring far acuity.
6. The claimant is capable of performing past relevant work as a food plant supervisor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 14, 2007 through the date of this decision (20 CFR 404.1520(f)).

Tr. at 9–16. The ALJ alternatively found that "considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform (20 CFR 404.1569 and 404.1569(a))." Tr. at 15.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) The ALJ erred in failing to find Plaintiff's alleged impairments of right arm and shoulder pain, vertigo, headaches, and loss of memory and concentration were severe;

2) The ALJ erred in assessing Plaintiff's residual functional capacity; and

3) The ALJ proposed an incomplete hypothetical to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

13

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the

findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      The ALJ's Step Two Determination was Reasonable

At step two, the ALJ found Plaintiff had the following severe impairments: syncope, vision problems, pain secondary to right wrist fracture, knee arthritis, and right

shoulder arthritis. Tr. at 11. Plaintiff alleges that the ALJ erred in failing to find Plaintiff's alleged impairments of right arm and shoulder pain, vertigo, headaches, and impaired memory and concentration to be severe. [Entry #12 at 19–27]. The Commissioner contends that whether the ALJ found these impairments severe is not legally relevant because the ALJ was required to consider both severe and non-severe impairments at subsequent steps of the sequential evaluation. [Entry #14 at 10]. The Commissioner further argues the ALJ's finding of right wrist pain, right shoulder arthritis, and syncope as severe impairments properly accounted for Plaintiff's alleged impairments of right arm and shoulder pain and vertigo. *Id.* at 10–12. Finally, the Commissioner argues that the ALJ reasonably found Plaintiff's headaches and alleged impaired memory and concentration were non-severe impairments. *Id.* at 13–15.

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. § 404.1508. It is the claimant's burden to prove that she suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987).

17

a.    Impaired Motion and Use of the Right Wrist and Shoulder

Plaintiff alleges the ALJ did not properly evaluate all of the evidence related to her alleged impaired motion and use of her right wrist and right shoulder and, consequently, erred in finding that these were not severe impairments.  [Entry #12 at 20–21].  This argument is without merit.   The ALJ found at step two that Plaintiff had severe impairments of pain secondary to right wrist fracture and right shoulder arthritis.  Tr. at 11.  Furthermore, in assessing Plaintiff's RFC, the ALJ limited her use of her right upper extremity to frequent reaching in all directions and frequent handling and fingering with her right hand.  Tr. at 12.  Plaintiff has failed to explain how the functional limitations associated with the "impaired motion/use of the right wrist and right shoulder" [Entry #12 at 21] differ from those associated with "pain secondary to right wrist fracture . . . and right shoulder arthritis."  Tr. at 11.  Plaintiff's argument relies on distinctions without a difference.  Consequently, the undersigned recommends affirming the ALJ's decision on this issue.[2]

b.    Vertigo

Plaintiff next argues the ALJ erred in not finding her vertigo to be a severe impairment.  [Entry #12 at 23–25].  In support of her argument, Plaintiff references

---

[2] As part of her argument on this issue, Plaintiff contends the ALJ inaccurately stated Plaintiff testified that her shoulder was not frozen anymore.  [Entry #12 at 20]. Plaintiff goes on to quote a portion of the transcript in which Plaintiff described her right shoulder pain.  *Id.*  Plaintiff, however, selectively quoted from the transcript and failed to include the remainder of the quoted sentence in which Plaintiff stated her shoulder "is no more frozen."  Tr. at 27.  Despite Plaintiff's argument to the contrary, the record makes clear that the ALJ accurately summarized Plaintiff's testimony with regard to her frozen shoulder.

medical records as well as her own testimony that she has fallen due to vertigo and continues to have episodes of "passing out." *Id.* at 24–25. The Commissioner counters that the ALJ found Plaintiff's syncope to be a severe impairment and Plaintiff cannot point to any work-related limitations resulting from her vertigo other than those the ALJ already identified. [Entry #14 at 11–12].

The undersigned agrees with the Commissioner. Plaintiff's complaints of passing out were directly addressed by the ALJ's finding of syncope as a severe impairment and any failure to identify vertigo as a severe impairment was harmless error. In his RFC assessment, the ALJ found Plaintiff must avoid even moderate exposure to hazards. Tr. at 12. In so finding, he referenced Plaintiff's complaints of dizziness and diagnosis of benign positional vertigo. Plaintiff has not identified any additional functional limitations as a result of her vertigo. For these reasons, the undersigned does not find that the ALJ's failure to identify vertigo as a severe impairment constitutes reversible error.

c.     Headaches

The ALJ's determination that Plaintiff's migraine headaches were not a severe impairment is likewise not reversible error because the finding is supported by substantial evidence. The ALJ referenced medical records noting that Plaintiff's headaches improved when she took her medication, but that she was noncompliant with her preventative medications. Tr. at 13–14. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1165–6 (4th Cir.1986). In August 2008, Dr. Chanson noted that Plaintiff's headaches had

"improved significantly" on medications. Tr. at 376. In December 2008, following Plaintiff's increased complaints of headaches, Dr. Chanson again noted that Plaintiff's tension headaches had improved with prophylactic medication and that her neurological exam was normal. Tr. at 375. In April 2009, Plaintiff saw Dr. Chanson complaining of a severe headache, but was noted to have been noncompliant with her medications. Tr. at 372. Based on these facts, the undersigned concludes the ALJ properly found Plaintiff's headaches were not a severe impairment.

d.    Impaired Memory and Concentration

Finally, Plaintiff contends the ALJ erred in his assessment of her complaints of impaired memory and concentration. [Entry #12 at 26]. In support of her argument, Plaintiff cites only her own testimony that she has had trouble performing math since her car accident. *Id.* "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Plaintiff's testimony is insufficient to establish the existence of a medically-determinable impairment, much less a severe one that significantly impacted her ability to perform basic work activities. *See* 20 C.F.R. § 404.1521.

Though not cited by Plaintiff, Dr. Chanson's treatment records document that Plaintiff exhibited limited short-term recall in November 2007. Tr. at 305. Follow-up records, however, state that Plaintiff's neurological examinations 2008 were normal and Plaintiff noted only "mild cognitive complaints of memory issues." Tr. at 375, 377.

20

Thus, even if Plaintiff's cognitive deficits are considered medically determinable, there is not substantial evidence in the record to show that they are severe impairments. Consequently, the undersigned finds the ALJ properly concluded Plaintiff's alleged impaired memory and concentration were not severe impairments.

### e.    Harmless Error

To the extent that the ALJ may have erred in finding any of the foregoing alleged impairments not to be severe, Plaintiff has suffered no harm.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").  A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").  The undersigned agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he considers that impairment in subsequent steps.  *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).  Here, the ALJ properly considered Plaintiff's foregoing impairments in determining her RFC, as discussed below.  Tr. at 12–14.

## 2. The ALJ Properly Assessed Plaintiff's RFC

Plaintiff argues the ALJ erred in assessing her RFC. The entirety of her argument is as follows:

> The ALJ erred in the assessment of all of Mrs. Martinez's physical and mental impairments as well as non-exertional impairments. Therefore, it flows that since the ALJ failed to consider all of Mrs. Martinez's impairments at Step Two of the Sequential Evaluation, that the resulting assessment of her RFC cannot be a complete assessment without the underlying basis and full assessment at Step two.

[Entry #12 at 28]. Plaintiff cites to no case law supporting this argument and offers no particulars as to how the RFC assessment was faulty. Plaintiff's argument appears to be that because the ALJ did not find certain of Plaintiff's alleged impairments severe at step two, the RFC determination is necessarily incomplete. This argument reflects a fundamental misunderstanding of the sequential evaluation process.

Pursuant to the governing regulations, in assessing a claimant's RFC, the ALJ must consider all medically-determinable impairments, including impairments that are not "severe." 20 C.F.R. § 404.1545. Thus, even if an ALJ finds that an impairment is non-severe, he is still required to consider it in determining the claimant's RFC.

Here, the ALJ identified Plaintiff's severe impairments at step two and subsequently assessed Plaintiff's RFC. In making that assessment, he specifically referenced Plaintiff's alleged impairments of wrist and shoulder pain, vertigo, headaches, and memory loss. Tr. at 13. The limitations he placed on Plaintiff's use of her right upper extremity are the functional manifestations of Plaintiff's severe impairments of right wrist fracture and right shoulder arthritis. These limitations make clear that the ALJ

considered Plaintiff's "impaired motion/use of the right wrist and shoulder" in determining her RFC.

With regard to Plaintiff's vertigo, the ALJ noted her diagnosis of benign positional vertigo and found Plaintiff must avoid even moderate exposure to hazards. Tr. at 12–13. Plaintiff has not alleged any specific limitations that the ALJ failed to include in his RFC assessment. The undersigned finds that in placing a limitation on Plaintiff's exposure to hazards, the ALJ properly considered Plaintiff's claimed impairment of vertigo.

The ALJ properly excluded any limitations related to Plaintiff's headaches from the RFC determination. Not only did Plaintiff not identify any specific limitations related to her headaches, but her medical records documented that her headaches were controlled when she was compliant with her preventative medication. Tr. at 13. Furthermore, there is no objective medical evidence in the record documenting Plaintiff was limited as a result of her headaches.

Finally, with regard to Plaintiff's alleged impaired memory and concentration, the ALJ noted at step two that Plaintiff testified to memory problems. Tr. at 12. In his RFC determination, the ALJ noted Plaintiff's complaints of memory loss, but also cited to Plaintiff's normal neurological findings. Tr. at 13–14. Although Plaintiff may have experienced some difficulties with short-term recall shortly following her car accident, Tr. at 305, those issues resolved or were, at worst, mild. Tr. at 375, 377. Furthermore, there is no indication in the record that Plaintiff's alleged cognitive deficits resulted in

any functional limitations. Thus, it was not error for the ALJ not to include any limitations related to memory or concentration in his RFC assessment.

For the foregoing reasons, the undersigned recommends finding the ALJ's RFC assessment was supported by substantial evidence and dismissing Plaintiff's second allegation of error.

### 3. The Hypothetical Question to the VE was Proper

Plaintiff argues that because the RFC finding was flawed and deficient, the proposed hypothetical question to the VE was also flawed, deficient, and not supported by substantial evidence. [Entry #12 at 28–29]. Plaintiff specifically contends that the hypothetical question to the VE "failed to include any limitations related to weakness, pain and limitation of motion and use of the right hand and arm." *Id.* at 29.

The undersigned previously concluded the ALJ's RFC assessment was supported by substantial evidence. *See* Section II.B.2., *supra*. The hypothetical question posed to the VE included the functional limitations identified in the ALJ's RFC finding. Tr. at 53. Furthermore, Plaintiff's argument that the hypothetical did not include limitations related to her right hand and arm is directly contradicted by the hearing transcript. In the hypothetical to the VE, the ALJ limited the hypothetical individual's use of her right upper extremity to frequent reaching in all directions and frequent handling and fingering with her right hand. Tr. at 53.

Thus, the undersigned recommends finding that the ALJ's hypothetical appropriately set out all of Plaintiff's impairments as supported by the medical record.

*Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.").

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 30, 2012                                    Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge


**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).